IN THE UNITED STATES COURT OF FEDERAL CLAIMS

(Electronically filed August 2, 2021)

| | |
|---|---|
| LORI HART, Executor of the Estate of Chris Hart, | ) ) ) |
| CASSANDRA HOSCH SURRATT, | ) ) |
| THOMAS S. MCSWAIN, | ) ) |
| MARY COLEMAN MCCLUNEY, the ESTATE OF MILLIE REID MCCLUNEY, and HEIRS OF MILLIE REID MCCLUNEY, | ) ) ) ) ) |
| LLOYD DIXON SELF, and | ) ) |
| TOWN OF PATTERSON SPRINGS, NORTH CAROLINA, | ) ) ) |
| For Themselves and As Representatives of a Class of Similarly Situated Persons, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) |

Case No. _____ **21-1652 L**

**CLASS ACTION COMPLAINT**

**SUMMARY OF THIS LAWSUIT**[1]

*This lawsuit is a Fifth Amendment taking case in which six North Carolina landowners ask this Court to order the federal government to pay them for land the federal government took from them. The government took these owners' land*

---

[1] This summary is not part of the complaint but is provided for the convenience of the Court and parties.

1

*for the rail-trail conversion in Cleveland County in North Carolina. This conversion was authorized under the National Trails System Act (Trails Act).[2]*

*When the government takes private property for the benefit of the entire community the government must justly compensate the owner whose property has been taken.[3] The United States Supreme Court held that the federal government's invocation of section 8(d) of the Trails Act takes an owner's private property, and the Just Compensation Clause of our Constitution compels the federal government to pay the owner for that property the federal government took, reimburse the owner's legal fees and litigation expenses, and pay the owner interest for the government's delay in compensating these owners.[4]*

*The federal government has not, however, paid these North Carolina landowners. The federal government has not even offered to pay these landowners. The only way these owners can vindicate their constitutional right to be justly compensated is to bring this inverse condemnation lawsuit. Accordingly, these owners ask this Court to order the federal government to pay just compensation for that property the federal government took, pay interest for the government's delay, and reimburse these owners' legal fees and litigation expenses.*

## JURISDICTION AND VENUE

1. The Tucker Act, 28 U.S.C. §1491(a), provides, "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded upon the Constitution."

## THE CONTITUTIONAL AND STATUTORY PROVISIONS GOVERNING THIS DISPUTE

2. The following provisions of the United States Constitution and the United States Code govern this dispute. The Fifth Amendment to the United States Constitution provides, "No

---

[2] The National Trails System Act of 1968 (as amended in 1983) (codified at 16 U.S.C. §1241, *et seq.*).

[3] See *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."), and *Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.")

[4] See *Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1 (1990) (*Preseault I*).

person shall…be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const., Amend. V.

Section 8(d) of the Trails Act, codified as 16 U.S.C. §1247(d), provides, "interim use [of abandoned railroad right-of-way easements for public recreation] shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."

The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654(c) (URA) (Pub. L. 91-646; 84 Stat. 1894), requires the federal government to reimburse these owners the "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

Section 4622(a) of the URA provides the federal government must also pay other expenses and costs an owner incurs including: (1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property; (2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation…(3) actual reasonable expenses in searching for a replacement business or farm."

Section 4622(d) of the URA provides the federal government must also pay the costs of relocating "utility facilities" including: "(i) any electric, gas, water, steam power, or materials transmission or distribution system; (ii) any transportation system; (iii) any communications system (including cable television); and (iv) any fixtures, equipment, or other property associated with the operation, maintenance, or repair of any such system."

## STATEMENT OF FACTS

1.      The railroad acquired its interest in the portion of the right-of-way affecting these Plaintiffs' property by prescriptive easement.

2. The rail line at issue is the former Railroad line extending a total of approximately 11.85 miles in Cleveland County, North Carolina. The line is comprised of two segments: (1) milepost SB 144.55 to milepost SB 154.50; and (2) milepost SB 158.10 and milepost SB 160.00 (collectively "the right-of-way").

3. The Railroad originally acquired the right-of-way in the late 1880s. See Abandonment Exemption filed in STB Docket No. AB-290 (Sub-No. 327X) (filed June 16, 2015), a copy is attached as **Exhibit 1.**

4. "The Line has been out of service since the end of 2010 and there is no active freight or passenger service." See Exhibit 1.

5. On June 18, 2015, the City of Shelby filed a request for trail use for the right-of-way. See Trail Use Request filed in STB Docket No. AB-290 (Sub-No. 327X) (filed June 18, 2015), a copy is attached as **Exhibit 2**.

6. On August 4, 2015, the STB issued the NITU, which authorized the Railroad to negotiate trail use with the City of Shelby. See Notice of Interim Trail Use or Abandonment filed in STB Docket No. AB-290 (Sub-No. 327X) (filed Aug. 4, 2015), a copy is attached as **Exhibit 3**.

7. The City of Shelby has not been authorized by the federal Surface Transportation Board to operate a railroad.

8. Apart from the STB's invocation of section 8(d) of the federal Trails Act, the railroad has no interest in the land under the former railway line and the railroad has nothing it can sell or transfer to the City of Shelby.

9. In *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (*en banc*) (*Preseault II*), the U.S. Court of Appeals for the Federal Circuit, sitting *en banc*, held the federal

government is constitutionally obligated to pay landowners when the STB invokes section 8(d) of the Trails Act. "[W]e conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government." 100 F.3d at 1532

10. The Federal Circuit held the federal government's liability in a Trails Act taking is established under a three-point analysis, as follows. See *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing *Preseault II*, 100 F.3d at 1533).

> (1) [W]ho owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;
>
> (2) [I]f the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and
>
> (3) [E]ven if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).[5]

## THE PARTIES

**A. The Cleveland County North Carolina, landowners.**

**Lori M. Hart, Executor of the Estate of Chris B. Hart**

11. Mr. Chris B. Hart acquired property in Cleveland County, North Carolina ("Hart property") on September l7, 2008 by that deed recorded in deed book 1561, page 2197 and on March 13, 2017 by that deed recorded in deed book 1748, page 753 in the Cleveland County Recorder of Deeds' Office. (A copy of these deeds is attached as **Exhibit 4**).

12. The Hart property abuts and underlies the former Railroad right-of-way which is now subject to an easement for an interim public-access trail and possible future railroad reactivation pursuant to the STB's order of August 4, 2015.

---

[5] The third point in this analysis arises only when the right-of-way easement originally granted the railroad included a right for a non-railroad to use the land for a public recreational trail.

13.     Chris B. Hart passed away on April 25, 2013, leaving Lori B. Hart as the Executor of the Estate of Chris B. Hart.

14.     Mr. Hart owned his property on August 4, 2015. (A true and accurate copy of the Cleveland County Tax Collector's tax record for 2015 is attached as **Exhibit 5**).

15.     Ms. Hart had no knowledge of the Railroad's planned abandonment prior to the issuance of the NITU on August 4, 2015. Indeed, she only recently became aware of the government's taking of his property on August 4, 2015.

**Cassandra Hosch Surratt**

16.     Ms. Hosch Surratt acquired property in Cleveland County, North Carolina on October 27, 1999 by that deed recorded in deed book 1258, page 1438 in the Cleveland County Recorder of Deeds' Office. (A copy of this deed is attached as **Exhibit 6**.)

17.     The Hosch Surratt property abuts and underlies the former Railroad right-of-way which is now subject to an easement for an interim public-access trail and possible future railroad reactivation pursuant to the STB's order of August 4, 2015.

18.     Ms. Hosch Surratt owned her property on August 4, 2015. (A true and accurate copy of the Cleveland County Tax Collector's tax record for 2015 is attached as **Exhibit 7.**)

19.     Ms. Hosch Surratt had no knowledge of the Railroad's planned abandonment prior to the issuance of the NITU on August 4, 2015. Indeed, she only recently became aware of the government's taking of his property on August 4, 2015.

**Thomas S. McSwain**

20.     Thomas S. McSwain and his late wife Shirley Lorraine McSwain, acquired property in Cleveland County, North Carolina ("McSwain property") on November 6, 1992 by

that deed recorded in deed book 1120, page 2154 in the Cleveland County Recorder of Deeds' Office. (A copy of this deed is attached as **Exhibit 8**.)

21. The McSwain property abuts and underlies the former Railroad right-of-way which is now subject to an easement for an interim public-access trail and possible future railroad reactivation pursuant to the STB's order of August 4, 2015.

22. Mrs. McSwain passed away on January 8, 2012 leaving Mr. McSwain as the sole owner of their property (*See* death certificate attached as **Exhibit 9**).

23. Mr. McSwain owned his property on August 4, 2015. (A true and accurate copy of the Cleveland County Tax Collector's tax record for 2015 is attached as **Exhibit 10)**.

24. Mr. McSwain had no knowledge of the Railroad's planned abandonment prior to the issuance of the NITU on August 4, 2015. Indeed, he only recently became aware of the government's taking of his property on August 4, 2015.

**Mary Coleman McCluney, The Estate of Millie Reid McCluney, and Heirs of Millie Reid McCluney**

25. Mary Coleman McCluney, The Estate of Millie Reid McCluney and Heirs of Millie Reid McCluney, acquired property in Cleveland County, North Carolina ("McCluney property").

26. The McCluney property abuts and underlies the former Railroad right-of-way which is now subject to an easement for an interim public-access trail and possible future railroad reactivation pursuant to the STB's order of August 4, 2015.

27. Millie Reid McCluney, Mary Coleman McCluney's mother, passed away on February 26, 1995, leaving Mary Coleman McCluney and Heirs of Millie Reid McCluney as the sole owners of her property. See death certificate attached as **Exhibit 10A**.

28. The McCluneys owned their property on August 4, 2015. (A true and accurate copy of the Cleveland County Tax Collector's tax record for 2015 is attached as **Exhibit 10B.**)

29. The McCluneys had no knowledge of the Railroad's planned abandonment prior to the issuance of the NITU on August 4, 2015. Indeed, they only recently became aware of the government's taking of their property on August 4, 2015.

**Lloyd Dixon Self**

30. Lloyd Dixon Self, acquired property in Cleveland County, North Carolina ("Self property") on January 19, 1991 by that deed recorded in deed book 1094, page 1074 in the Cleveland County Recorder of Deeds' Office. (A copy of this deed is attached as **Exhibit 11**).

31. The Self property abuts and underlies the former Railroad right-of-way which is now subject to an easement for an interim public-access trail and possible future railroad reactivation pursuant to the STB's order of August 4, 2015.

32. Mr. Self owned his property on August 4, 2015. (A true and accurate copy of the Cleveland County Tax Collector's tax record for 2015 is attached as **Exhibit 12**).

33. Mr. Self had no knowledge of the Railroad's planned abandonment prior to the issuance of the NITU on August 4, 2015. Indeed, he only recently became aware of the government's taking of his property on August 4, 2015.

**Town of Patterson Springs, North Carolina**

34. The Town of Patterson Springs acquired property in Cleveland County, North Carolina ("Patterson Springs property").

35. The Patterson Springs property abuts and underlies the former Railroad right-of-way which is now subject to an easement for an interim public-access trail and possible future railroad reactivation pursuant to the STB's order of August 4, 2015.

36. The Town of Patterson Springs owned its property on August 4, 2015.

37. The Town of Patterson Springs had no knowledge of the Railroad's planned abandonment prior to the issuance of the NITU on August 4, 2015. Indeed, it only recently became aware of the government's taking of its property on August 4, 2015.

**B. The Defendant.**

38. The United States of America is the defendant. The federal government took these North Carolina owners' land for a public recreational trail and railbanking by an order of the federal Surface Transportation Board invoking section 8(d) of the federal Trails Act. The Federal Circuit, sitting en banc, explained that Trails Act takings were the responsibility of the federal government, holding, "[W]e conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government. ... The Federal Government authorized and controlled the behavior of the State [here the North Carolina local governments] in this matter, and the consequences properly fall there." *Preseault II*, 100 F.3d at 1531.

## CAUSES OF ACTION

### COUNT I

*An action for "Just Compensation" under the Fifth Amendment
to the United States Constitution.*

39. The federal government took these North Carolina owners' property and the Just Compensation Clause of the Fifth Amendment to our Constitution requires the federal government to pay these owners for what the government took.

40. Congress amended the Trails Act in 1983 for the explicit purpose of authorizing the ICC (now the STB) to take an owner's state-law right to unencumbered title and possession of the owner's land following a railroad's abandonment of its railway easement. Congress

9

intended section 8(d), when invoked, to impose new and different easements upon the owner's land and to perpetuate the STB's jurisdiction over the owner's land.6

41. In *Preseault I*, the Supreme Court found the Trails Act to be constitutional because it was an exercise of Congress's eminent domain authority.  By exercising its eminent domain power Congress could enact section 8(d) of the Trails Act and allow the ICC (now the STB) to redefine existing state-law property interests and take private property for public recreation and railbanking.

42. But, the Supreme Court continued, the Fifth Amendment requires the United States to justly compensate owners for the value of that property taken when the government invokes section 8(d).  Justice Brennan wrote for a unanimous Court:

> This language [section 8(d)] gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests.  While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations.  State law generally governs the disposition of reversionary interests … By deeming interim trail use to be like discontinuance rather than abandonment, Congress prevented property interests from reverting under state law.

*Preseault I*, 494 U.S. at 8.[7]

43. Justice O'Connor (joined by Kennedy and Scalia) concurred to emphasize "[A] sovereign, 'by *ipse dixit*, may not transform private property into public property without compensation . . . . This is the very kind of thing that the Taking Clause of the Fifth Amendment

---

[6] See *Preseault I*, 494 U.S. at 8. See also *Trevarton v. South Dakota*, 817 F.3d 1081, 1087 (8th Cir. 2016) (holding the invocation of section 8(d) imposes a new and different easement upon the owner's land), *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1149 (DC Cir. 2001), and *Nat'l Wildlife Found. v. Interstate Commerce Comm'n*, 850 F.2d 694, 697-98 (DC Cir. 1988) (explaining that Congress intended to extinguish owners' state-law property rights).

[7] Citations omitted.

was meant to prevent.'" *Preseault I*, 494 U.S. at 23 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1012 (1984), which in turn, quoted *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980)).[8]

44.     The Federal Circuit, sitting *en banc*, in *Preseault II*, 100 F.3d at 1531, followed *Preseault I,* and held:

> [W]e conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government … In the case before us there was a similar physical entry upon the private lands of the [property owners], acting under the Federal Government's authority pursuant to the ICC's [now STB's] Order. That it was for a valued public use is not the issue. We have here a straightforward taking of private property for a public use for which just compensation must be paid.

45.     In *Ellamae Phillips*, 564 F.3d at 1373, a panel of the Federal Circuit summarized the Federal Circuit's en banc holding in Preseault II and noted the federal government's liability turns upon three questions:

> (1) [W]ho owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;
>
> (2) [I]f the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and
>
> (3) [E]ven if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).[9]

Under North Carolina law, these present-day North Carolina landowners: 1) owned the land and the railroad held only an easement; 2) the railroad held only a right to operate a railway across the strip of land and the railroad did not have any right to sell or transfer the land to a non-

---

[8]  In *Stop the Beach Renourishment, Inc. v. Florida*, 560 U.S. 702, 713 (2010), the Supreme Court reaffirmed its holding that the government "effect[s] a taking if they recharacterize as public property what was previously private property."

[9] See ¶10 and note 5, *supra.*

11

railroad for public recreation or railbanking; and 3) whatever interest the railroad held in the right-of-way easement unequivocally terminated when the railroad no longer operated a railway across the strip land.

46.  An easement for the operation of a railroad is entirely different than an easement for public recreation. The Federal Circuit explained this fundamental point when it held:

> It is elementary law that if the Government uses (or authorizes the use of—a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation—the railroad cannot give what it does not have.
>
> And it appears beyond cavil that use of these easements for a recreational trail—for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway—is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through (no depots or turntables or other appurtenances are involved on these rights of way). In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time. In the one case, the landowner could make such uses of the property as were not inconsistent with the railroad's use, crossing over the tracks, putting a fruit stand on one edge of the property, or whatever. In the other, the government fenced the trail in such a way as to deny that access.
>
> Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other. Under the law, it is the landowner's intention as expressed in the grant that defines the burden to which the land will be subject. The Government does not dispute this proposition—the Government agrees that, consistent with the state's law, the landowner's grant defines the burden with which the land is burdened.

*Toews v. United States*,
376 F.3d 1371, 1376-77 (Fed. Cir. 2004).

47.  But for the STB invoking section 8(d) of the Trails Act, these North Carolina landowners would have held and enjoyed unencumbered title and these owners would have had

exclusive right to possess their property free of any easement for recreational trail use or railbanking.

48. The federal government's liability was established when the STB issued its order invoking section 8(d) of the Trails Act on December 21, 2018. See *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), *Barclay v. United States*, 443 F.3d 1368 (2006), and *Illig v. United States*, 274 Fed. Appx. 883 (2008), *cert. denied*, 557 U.S. 935 (2009). See also Solicitor General Kagan's Brief for the United States in Opposition to Petition for Writ of Certiorari in *Illig v. United States*, 2009 WL 1526939. In *Barclay* the Federal Circuit held that an owner's right to compensation in a Trails Act taking arises when the STB first issues its order invoking section 8(d). Specifically, Judge Dyk of the Federal Circuit wrote:

> The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Abandonment is suspended and the reversionary interest is blocked "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)" of the Trails Act. We concluded that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way. Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.

*Barclay*, 443 F.3d at 1373.[10]

49. These North Carolina owners' right to be justly compensated for that property the federal government took from them does not depend upon whether (or when) the railroad and a trail-user reach some agreement, transfer the right-of-way, or when the trail-user builds a public recreational trail across these owners' land. The government's liability for a Fifth Amendment

---

[10] See also *Ladd v. United States*, 630 F.3d 1015, 1020 (Fed. Cir. 2010) (*Ladd I*), *reh'g denied*, 646 F.3d 910 (Fed. Cir. 2011); *Ladd v. United States*, 713 F.3d 648, 652 (Fed. Cir. 2013) (*Ladd II*).

taking is defined by what the owner lost, not what the taker gained. See Justice Holmes decision for a unanimous Supreme Court in *Boston Chamber of Commerce v. City of Boston,* 217 U.S. 189, 195 (1910) ("And the question is, What has the owner lost? Not, What has the taker gained?") See also *First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 321-22 (1987) ("a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change") (quoting *Pennsylvania Coal*, 260 U.S. at 416). These owners lost their right to unencumbered title and exclusive possession of their land when the STB invoked section 8(d) in December 2018.

50.     The Federal Circuit and the Supreme Court hold the STB's invocation of section 8(d) takes an owner's state-law right to unencumbered title and exclusive possession of the owner's land and this dispossession of the owner's state-law right to use their land defines the nature of the government's taking – and the measure of compensation the owner is due. In *Ladd I*, 630 F.3d at 1024-25, the Federal Circuit held:

> Hence it is irrelevant that no trail use agreement has been reached and that no recreational trail has been established. … "a taking occurs when the owner is deprived of use of the property...by blocking the easement reversion. While the taking may be abandoned ... by the termination of the NITU[,] the accrual date of a single taking remains fixed." *Caldwell*, 391 F.3d at 1235. We further explained: "The NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued." *Id.* Thus, the NITU forestalls or forecloses the landowners' right to unencumbered possession of the property. *Cf. Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831, (1987) ("To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather ... 'a mere restriction on its use,' is to use words in a manner that deprives them of all their ordinary meaning.").[11]

---

[11] Internal citations omitted. See also *Navajo Nation v. United States*, 631 F.3d 1268, 1275 (Fed. Cir. 2011), in which the Federal Circuit affirmed its holding in *Ladd I* as "explaining that a takings claim accrues when the government takes action which deprives landowners of 'possession of their property unencumbered by [an] easement,' regardless of whether third

14

51. That this land was taken from these owners for a public amenity such as a public recreational trail does not mitigate the government's constitutional obligation to justly compensate these owners.  Justice Holmes cautioned, "[w]e are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving that desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  Similarly, Justice Black wrote, "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960).  See also *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 324 (1983) ("the right to compensation is an incident to the exercise of that power [of eminent domain]; that the one is so inseparably connected with the other that they may be said to exist, not as separate and distinct principles, but as parts of one and the same principle.").[12]

52. The Fifth Amendment requirement of justly compensating an owner from whom the government takes property includes:  (a) the full fair market value of the property taken as of the date it was appropriated by the federal government – fair market value includes not only the value of the land physically confiscated but also any "severance damages" or loss in value to the property owner's entire parcel caused by the government's taking; and, (b) payment of an

---

parties ever take physical possession of that easement" and its holding in *Caldwell* as "concluding that any taking occurred when the government took action preventing landowners' state law reversionary interests in a railroad right-of-way from vesting, not when subsequent actions by third parties caused the right-of-way to be converted to an interim trail for recreational use."

[12] Citing, *inter alia*, *Pumpelly v. Green Bay Co.*, 80 U.S. 166 (1871).

additional amount necessary to compensate the property owner for the government's delay in paying the property owner "just compensation."

53. The Supreme Court held, "The compensation to which the owner is entitled is the full and perfect equivalent of the property taken. It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken. He is entitled to the damages inflicted by the taking." *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923).[13]

54. The federal government's obligation to pay interest begins when the STB first invokes §1247(d). Here that date is December 21, 2018. The federal government must pay interest calculated at the Moody's Aaa rate from December 21, 2018, until the United States Treasury actually pays each owner. See *Miller v. United States*, 620 F.2d 712 (Ct. Cl. 1980); *Pitcairn v. United States*, 547 F.2d 1106 (Ct. Cl. 1976); *Tektronix, Inc. v. United States*, 575 F.2d 832 (Ct. Cl. 1978), *cert. denied*, 439 U.S. 1048; *Georgia Pacific v. United States*, 640 F.2d 328 (Ct. Cl. 1980); *Miller v. United States*, Court of Federal Claims No. 03-2489L (Order of August, 22, 2006), at *2; *Biery v. United States*, Court of Federal Claims Nos. 07-693L & 07-675L, 2012 WL 5914521, at *4 (Fed. Cl. Nov. 27, 2012); *Love Terminal Partners v. United States*, 126 Fed. Cl. 389 (2016); and *Sears v. United States*, 124 Fed. Cl. 730 (2016). See also Mark F. Hearne, II, *The Fifth Amendment Requires the Government to Pay an Owner Interest Equal to What the Owner Could Have Earned had the Government Paid the Owner the Fair-Market Value of Their Property on the Date the Government Took the Owner's Property*, 1 BRIGHAM–KANNER PROP. RIGHTS CONFERENCE J. 3 (2012).

---

[13] Citing *Monongahela*, 148 U.S. at 327.

## COUNT II

*An action for damages under the Uniform Relocation Act.*

55. The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654(c) (URA) (Pub. L. 91-646; 84 Stat. 1894), requires the federal government to reimburse these owners the "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

56. Section 4622(a) of the URA provides the federal government must also pay other expenses and costs an owner incurs including: (1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property; (2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation … (3) actual reasonable expenses in searching for a replacement business or farm."

57. Section 4622(d) of the URA provides the federal government must also pay the costs of relocating "utility facilities" including: "(i) any electric, gas, water, steam power, or materials transmission or distribution system; (ii) any transportation system; (iii) any communications system (including cable television); and (iv) any fixtures, equipment, or other property associated with the operation, maintenance, or repair of any such system."

58. These five owners have incurred those costs and expenses which the URA requires the federal government to pay and reimburse these owners.

**THIS IS A CLASS ACTION BY THE NAMED PLAINTIFFS ON THEIR OWN BEHALF AND AS REPRESENTATIVES FOR SIMILARLY SITUATED CLEVELAND COUNTY, NORTH CAROLINA, LANDOWNERS**

59. Plaintiffs request that this action be certified as a representative class action pursuant to RCFC 23 and that they be named class representatives on behalf of similarly situated Cleveland County, North Carolina, landowners.

60.    This action satisfies the procedural requirement of RCFC 23 because: (a) the class is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the class; (c) the claims of the named Plaintiffs are typical of the claims of the class; and (d) the named Plaintiffs and their counsel will fairly and adequately protect the interests of the class.

### RELIEF REQUESTED

For those reasons set forth above, this Court should enter an order granting these North Carolina landowners the following relief and order the federal government to:

A.    Pay these owners the full fair-market value of that property the federal government took from these North Carolina landowners.

B.    Pay these owners compensation for the delay between when the government took the owners' property in December 2018 and the actual date when the government finally honors its constitutional obligation and pays these owners compensation for the land it took.

C.    Reimburse these owners' attorney fees and litigation expenses as provided in the URA, 42 U.S.C. §4654(c), which includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

D.    Award such further relief as this Court may deem just and proper.

Date: August 2, 2021                                    Respectfully submitted,

                                                        **TRUE NORTH LAW, LLC**

*/s/ Mark F. (Thor) Hearne, II*
MARK F. (THOR) HEARNE, II
Stephen S. Davis
True North Law, LLC
112 South Hanley Road, Suite 200
St. Louis, MO 63105
Phone: (314) 296-4000
Fax:    (314) 296-4001
thor@truenorthlawgroup.com
sdavis@truenorthlawgroup.com

*Attorneys for Plaintiffs*